UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

——————

EARNEST GORDON, III, # 238573,      )
                                    )
                Petitioner,         )      Case No. 1:09-cv-521
                                    )
v.                                  )      Honorable Paul L. Maloney
                                    )
JEFFREY WOODS,                      )
                                    )
                Respondent.         )      )
————————————————————————————)

## <u>OPINION</u>

This is a habeas corpus proceeding brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner's conviction arises out of the killing of Ean French, which occurred sometime between the late hours of February 3, 2003, and the early hours of February 4, 2003. Petitioner testified that he was a drug dealer and that he had been at French's house in rural Kent County, Michigan, with Corey McCullough and Edward Johnigan on the night in question solely to conduct a drug transaction. He denied taking any part in robbing or killing French.

When Edward Johnigan testified at petitioner's trial, he had already received a separate trial based on his role in French's death, and he had been convicted of "first-degree murder, under dual theories of premeditation and felony murder, and possession of a firearm during the commission of a felony." *People v. Johnigan*, No. 258961, 2006 WL 932302, at * 1 (Mich. Ct. App. Apr. 11, 2006). Johnigan had previously been convicted for his role in two other murders, and he had been sentenced

to life imprisonment.  (*See* Michigan Court of Appeals Op. at 1, ECF No. 55) (citing *People v. Johnigan*, 696 N.W.2d 724 (Mich. Ct. App. 2005)).  The Michigan Court of Appeals described Johnigan as a "hardened contract killer" who "will spend the rest of his life in prison on the basis of his murder convictions."  696 N.W.2d at 732.

Johnigan offered testimony in support of petitioner's version of events, claiming that he had decided to rob and kill French after petitioner and McCullough left.[1] Johnigan testified that he acted alone.  Apparently, the jury did not find petitioner and Johnigan's respective testimony to be credible, as it convicted petitioner of second-degree murder.

The trial court sentenced petitioner as an habitual offender, third felony offense, to sixty to ninety years' imprisonment.  This sentence was to be served consecutive to the remainder of a two year term of imprisonment and a one to twenty year term of imprisonment on earlier criminal convictions for which petitioner was on parole when he committed this crime.

After unsuccessful attempts to overturn his conviction in state court, petitioner filed this habeas corpus petition.  The twelve grounds that petitioner raises in his

---

[1]Petitioner's initial trial had been a consolidated trial with co-defendant Corey McCullough before separate juries.  This trial ended in a mistrial with regard to petitioner.  McCullough was found guilty of second-degree murder and possession of a firearm during the commission of a felony.  (*See* Michigan Court of Appeals Op. at 1, ECF No. 55; *see also* ECF No. 19-36; *People v. McCullough*, No. 260592, 2008 WL 3349072, at * 1 (Mich. Ct. App. Aug. 12, 2008).

Third Amended Petition are as follow:[2]

I.     The prosecutor's race-neutral reasons for dismissing minority (i.e. African American and Hispanic) jurors were insufficient to avoid a finding of purposeful discrimination in the exercise of peremptory challenges.  Further, the trial court's finding that the reasons were adequate was clearly erroneous and the court's rejection of the defense claim was an abuse of discretion.

II.    The trial court's allowance of evidence of another uncharged 1999 robbery where the victim expressly advised the petitioner as not being the person who robbed him was an abuse of discretion and denied petitioner's  federal constitutional right to a fair trial.

III.   The evidence presented at trial was insufficient to support the jury's verdict finding petitioner guilty of second-degree murder.

IV.    The trial court's replacement of an absent juror with an alternate juror was an abuse of discretion which violated petitioner's Sixth Amendment rights.

V.     The prosecutor violated petitioner's right to remain silent and a fair trial "by admitting evidence of petitioner Gordon's [in]voking his right to remain silent and request for an attorney."

VI.    Prosecutorial misconduct in closing argument deprived petitioner of a fair trial.

VII.   The judge's comment indicating that co-defendant McCullough had not yet been sentenced deprived petitioner of a fair trial.

---

[2]Petitioner raised seventeen grounds in his second amended petition.  (ECF No. 11).  Respondent filed an answer.  (ECF No. 15).  Petitioner subsequently filed a motion for leave to file a third amended petition (ECF No. 66) for the purpose of withdrawing five of the claims in light of the arguments raised by respondent's answer.  (*See* 5/19/14 Order at 1, ECF No. 71, PageID.907).  The proposed Third Amended Petition was deemed filed *instanter*.  (*Id.*).  Respondent's answer to the second amended petition stood as the answer to the third amended petition.  (*Id.*, PageID.908).  At petitioner's request, the case caption was "amended to show Jeffrey Woods, Warden of the Chippewa Correctional Facility, as respondent."  (*Id.*).

VIII.   The trial court violated petitioner's due process and equal protection rights by admitting, over an objection, highly prejudicial evidence without a proper foundation.

IX.   The trial court judge violated petitioner's due process rights by giving a modified accomplice instruction over defense counsel's objection.

X.   Petitioner's right to a fair trial was violated when the prosecution's witness "asserted her Fifth Amendment privilege and continued to testify without the court conducting a hearing outside the presence of the jury."

XI.   Petitioner was denied his Sixth Amendment right to effective assistance of trial and appellate counsel.

XII.   The cumulative effect of the above-referenced errors denied petitioner a fair trial.

(Third Amended Petition at 5-6, ECF No. 73, PageID.914-15).[3]

Respondent argues that grounds I through IV should be denied for lack of merit. (*See* ECF No. 15 at 42-57, PageID.808-23). Respondent argues that Grounds V through XII are procedurally defaulted. (*Id.* at 19, 25-41, PageID.785, 791-807).

After review of the state-court record, the petition will be denied. Grounds I through IV were considered and rejected by the Michigan Court of Appeals. Petitioner has not shown that the decision on these claims by the Court of Appeals was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," nor that they were based on "an unreasonable determination of the facts in light of the evidence presented in the

---

[3]Petitioner's references to his rights under Michigan law have been ignored. Federal habeas corpus relief can only be granted on grounds that the prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

State court proceeding." 28 U.S.C. § 2254(d).  Grounds V through XII are procedurally defaulted for failure to present them in petitioner's appeal as of right, and petitioner has not shown cause and prejudice or actual innocence to excuse the defaults. Petitioner has not established grounds for federal habeas corpus relief.

### Standard of Review

The Court's review of this petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands the state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted).  "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). "State-court factual findings [] are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence." *Davis v. Ayala*, 135 S. Ct. 2187, 2199-2200 (2015) (citations and internal quotations omitted).

If a state court adjudicated the claim, deferential AEDPA standards must be applied.   28 U.S.C. § 2254(d); *see Premo v. Moore*, 562 U.S. 115, 121 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (("[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)).  AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  It

prohibits "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012) (*per curiam*).

The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "Section 2254(d) reflects the that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Id.* at 102-03 (citation and internal quotation omitted); *see Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). Section 2254(d) states that an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see White v. Wheeler*, 136 S. Ct. 456, 460 (2015); *Davis v. Ayala*, 135 S. Ct. at 2198; *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014).

The only definitive source of clearly established federal law for purposes of § 2254(d)(1) is the holdings—not dicta—of Supreme Court decisions. *White v. Woodall*, 134 S. Ct. at 1702; *see Woods v. Donald*, 135 S. Ct. at 1377 ("Because none of our cases confront 'the specific question presented by this case,' the state court's decision could

not be 'contrary to' any holding from this Court."). "[W]here the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *Id.* (quotations and internal citations omitted).

An unreasonable application of the Supreme Court's holding must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)). Rather, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Harrington v. Richter*, 562 U.S. at 103). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' " and "[i]t therefore cannot form the basis for habeas relief under AEDPA." *Hill v. Curtin*, 792 F.3d 670, 677 (6th Cir. 2015) (quoting *Parker v. Matthews*, 132 S. Ct. at 2155); *see Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) (*per curiam*) ("As we have repeatedly emphasized, [] circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'").

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Section 2254 (d)(2) requires that this Court accord the state trial court substantial deference. If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not

suffice to supersede the trial court's determination. *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015); *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).

## Findings of Fact

### A.    Circuit Court Proceedings

Petitioner was charged with first-degree felony murder, first-degree premeditated murder, and possession of a firearm in the commission of a felony.  His trial began on October 18, 2004, and it concluded on November 9, 2004, with the jury's verdict finding him guilty of second-degree murder in the killing of Ean French.  (Trial Transcripts , TT1-TT17, ECF No. 37-53).

Petitioner was represented by counsel.  During jury selection, petitioner's attorney objected to some of the peremptory challenges exercised by the prosecutor under *Batson v. Kentucky*, 476 U.S. 79 (1986).  Judge Johnston overruled the objections, finding that the prosecutor's exercise of peremptory challenges had not been based on racially discriminatory reasons.  (TT1, 68-78, 154-56; *see also* TT1, 12, 33, 51-52, 112-18).

The prosecutor moved to be allowed to present 404(b) evidence that petitioner had previously used duct tape to restrain a robbery victim, Brandon O'Connor.  Prior to ruling on the motion, the court noted that, in light of the earlier mistrial, the court and the attorneys had a good idea what evidence would be presented.  (TT2, 3-8). Judge Johnston ruled that the evidence was admissible, explaining:

> Well, it seems to me that if the defense intends to proceed along the same line as it did previously [by relying on Mr. Johnigan's testimony], that the 404(b) evidence becomes all the more compelling because duct taping robbery victims by Mr. Gordon seems to be something of a trademark and

certainly a modus operandi.  Given the probable line of defense, it seems to me that this is admissible evidence for proving that this is an unlikely coincidence here and to show, method, scheme, or plan or system of doing an act, otherwise known as modus operandi.  It seems to me this makes it in the nature of the case less likely that Mr. Gordon had nothing to do with the crime, which seems to be the general line of the defense here.

(TT2, 8-9).

The prosecutor's opening statement described the evidence that the prosecution would be presenting to establish that on or about February 3, 2003, petitioner, Corey McCullough, and Edward Johnigan came to Ean French's house in Courtland Township, Kent County, Michigan, where they robbed and killed French.  French had been a drug dealer.  He had been bound with duct tape and shot in the back a dozen times, six shots from a .40 caliber Beretta and another six shots from a .380.  (TT2, 18-44).

Petitioner's attorney outlined the defense in his opening statement, asserting that Edward Johnigan killed Ean French, and noting that Johnigan, had already been convicted.  Petitioner's attorney indicated that petitioner would not be disputing that he had been to French's house a number of times beforehand for heroin deals.  He also would not be disputing that he had been at French's house on the night police believed French had been killed.  (TT2, 45-48).

James Schultz testified that on Thursday, January 30, 2003, he had been at Ean French's house with two other men: petitioner, Ernest Gordon a/k/a Peewee, and Damien Johnson a/k/a Slick.  (TT3, 71, 103-04).  Schultz knew Johnson, but this was his first encounter with petitioner.  Petitioner, Schultz, and Johnson were delivering close to a thousand dollars worth of heroin to Ean French.  Johnson was a drug dealer

and he provided the heroin that he had obtained in Detroit.  Schultz knew the directions to French's house.  Petitioner was the driver for the group.  Johnson knew petitioner and agreed to pay petitioner $100 to drive him to French's house.  (TT3, 72-76, 106, 109-10, 128-29; TT7, 16-17).  Schultz did not think that petitioner knew Ean French.  During the car trip there had been a discussion about French's selling of marijuana. Schultz testified that it was obvious that French had money: "he lives out here in the woods.  I mean, you roll up you see the toys and the cars and the TVs[.]" (TT3, 77).  In fact, that day French had a new big screen television inside a trailer behind his vehicle.  Petitioner and the others helped French move the televison from the trailer into French's house.  (TT3, 75, 106-07).  While petitioner and the others were inside the house, French had shown them some of his high quality marijuana. (TT3, 77, 113).

The next day, petitioner and Johnson brought French more heroin.  Petitioner was the driver and he supplied this heroin.  Petitioner did not require directions.  He remembered the directions from the night before.  On this occasion, French showed them "more pounds of weed."  (TT3, 114-16, 133-34, 139).

Christian Burke, French's friend, testified that February 3, 2003, had been the last time that he had seen French alive.  (TT2, 49-50, 59).  They had been at French's house, smoking marijuana and watching a movie on French's new television.  (TT2, 71-73).  Burke testified that, sometime earlier, French gave him $6200 in $50 bills and that Burke had arranged for a "no receipt" purchase of that television from someone at Classic Stereo.  (TT2, 90-91).  Burke knew that French sold drugs for a living.

French's job as a power washer would not have paid enough for the nice things he had. (TT2, 50).  French was primarily involved in selling high quality marijuana.  (TT2, 80; TT3, 25, 70-71, 89, 91; TT10, 81-82, 84, 92).  Around February 3, 2003, French had received a large shipment of marijuana for which he paid around $70,000.  (TT2, 51). French also kept at his residence a large number of prescription pills, including Valium, Xanax, and Vicodin.  (TT2, 50, 81; TT3, 10).  French had a large stack of Viagra sample packages.  There appeared to be more pills than any individual could use in a lifetime.  (TT2, 77, 91; TT3, 10, 61).  French indicated that Burke had to leave because he had "buddies" coming over.  (TT2, 74-75).  Given his knowledge of French's primary source of income, Burke suspected that French had a drug deal going down. (TT2, 92-93).

Christian Burke returned to Ean French's house on February 7, 2003.  He had been contacted by French's mother, Linda French.  (TT2, 103-05).  Burke went to Ean French's house to check on him, accompanied by a friend named Carl Romence.  (TT2, 54-55; TT4, 6-7).  When Burke pulled his truck in the driveway, he noted that the porch light was on in the middle of the day and that the storm door was shut but the front door of French's house was open.  (TT2, 56-57).  When Burke entered, he saw duct tape wrapped around French's hands.  French's legs were also bound with duct tape. (TT2, 59, 68, 88).  French was dead.  His body was a bloody mess of gunshot or stabbing wounds.  A couch was on top of his body.  (TT2, 59).  French's house had been ransacked (TT2, 64, 68), and his XBox gaming system was missing. (TT2, 67, 88; TT3, 5). Mr. Romence had stayed outside in Christian Burke's truck.  When Burke returned

he was distraught. He told Romence that Ean French was dead and that the house was in shambles. (TT4-9, 14).

Ean French's autopsy indicated that he had been killed around midnight of February 3, 2003, into the early morning hours of February 4, 2003. (TT8, 9). The victim's hands and legs had been bound with duct tape. (TT8, 10). There was a 3/4 inch deep stab wound in French's upper right arm and shoulder region. (TT8, 13, 52). This wound could have been inflicted with the knife found imbedded in the carpet next to the victim's body. (TT4, 40; TT8, 15). French had been alive when this knife wound was inflicted. (TT8, 18). Tests on the knife revealed a mixture of DNA from Ean French and Edward Johnigan. (TT4, 99-101, 106).

When the police arrived at Ean French's house on February 7, 2003, it was apparent that French had been dead for some time. The victim was face down with a lot of pooling of blood into his face area. (TT3, 98). French's body had a total of 12 gunshot wounds. (TT8, 30). Not all the gunshots had been delivered while French had been face down on the floor. He had been shot twice though his left forearm and these were non-lethal injuries. (TT8, 21, 26). French had either been on his knees or standing when some of the gunshot wounds had been inflicted. (TT8, 21-26, 41-42). Most of the gunshots were through the victim's back. He was also shot in the neck. All the wounds had been sustained in a matter of minutes and every gunshot other than the two shots through the left forearm would have been fatal on its own. (TT8, 26-36). The gunshot wounds were consistent with two shooters, each holding a separate caliber gun, one shooting on the left side and one shooting on the right, and

some shooter having to change his position to be standing over French's body and shooting him three times. (TT8, 42, 73). French had also been subjected to blunt force trauma to the back of his head. French had been alive when he received this blow to the head. (TT8, 16-18, 55).

Bullets were recovered from French's body, the floor, and the basement. (TT4, 36). A total of five bullets were recovered from Ean French's body. One bullet came from a large caliber weapon and the other four came from a medium caliber weapon. (TT8, 36-38). A total of twelve spent casings were recovered: six .40 caliber casings and six .380 caliber casings. (TT4, 33-34). One of the pieces of duct tape found on the floor near the victim physically fit the end of a known roll of duct tape recovered from Edward Johnigan's residence. (TT4, 44, 46, 49, 118-19; TT8, 109-10).

French's house had been ransacked. (TT3, 99). Cupboard doors and drawers in the kitchen were open and the contents appeared to have been rifled through. (TT4, 24-25). Bedroom sheets and the mattress pad had been pulled up. (TT4, 55-56). Clothing had been pulled out of cabinets and closets. (TT4, 56). A toilet tank cover had been removed. (TT4, 57). Cabinet drawers were opened and the contents spilled on the floor. (TT4, 57). French's wallet was open and there was no money inside it. (TT4, 24). It appeared that the house had been searched. (TT8, 99-101; TT9, 10- 20, 29, 33).

With the assistance of a trained canine, police were able to find a duffel bag in a hidden compartment in the attic space of the master bedroom. It contained a substantial quantity of very high grade marijuana. (TT4, 58; TT6, 106, 111-12; TT8, 109-11; TT9, 3-4, 23-26). Police found drug paraphernalia in other areas of the house,

including spoons with residue and hypodermic needles. (TT4, 59). They did not recover any Viagra. (TT4, 60-61).

Gerald McBurrows testified that Corey McCullough was his friend. McCullough and a young lady came to visit McBurrows in Atlanta. McBurrows owned a .40 caliber Beretta. McBurrows indicated that he left the gun in McCullough's car. Although McCullough promised to return the gun, he never did. When police arrested Corey McCullough, he was living in Atlanta with McBurrows. (TT5, 8-16; TT9, 82). Police recovered the .40 caliber Beretta from Edward Johnigan's residence. (TT5, 21-25; TT6, 109). This .40 caliber Beretta had been used in shooting six of the twelve shots fired into Ean French. (TT5, 49-55).

Cherie Hatcher testified that she had been petitioner's girlfriend in the early months of 2003. (TT6, 89-90). Nicholas Thomas testified that he had attempted to buy a .380 caliber handgun from Ms. Hatcher. Hatcher referred to the gun as her baby and she refused to sell it to Mr. Thomas. (TT7, 21-23). Hatcher had a white van. (TT6, 90-91). The other vehicle shown on a security video was a white, four-door, 1994 Pontiac Grand Prix, that belonged to Johnigan's sister. (TT6, 108; TT7, 5).

Phone records indicated that, on February 3, 2003, at 10:12 p.m. a call had been placed to Ean French from a pay phone located in the Meijer's store on Alpine Avenue. (TT9, 89-90, 98; TT10, 28). Security footage showed Hatcher's white van. Immediately behind the van was Johnigan's sister's white Grand Prix. (TT9, 95). At 10:15 p.m. petitioner's phone was involved in a nearly seven-minute phone call with Hatcher's phone. The signal hit the cell phone tower for the Meijer store coverage area. (TT9,

104).  At approximately 10:22 p.m., the van left the Meijer parking lot with the white car following it out.  (TT9, 105).  At 11:05 p.m., there was a ten-second phone exchange between Corey McCullough's phone and petitioner's phone, the signals from both phones using the same cell tower near French's residence.  There was a period of cessation of calls involving petitioner, McCullough, and Johnigan after the ten-second call.  When petitioner received a 25-second call from Damien Johnson at 11:58 p.m., petitioner's cell phone signal continued to hit the cell phone tower associated with French's residence.  (TT10, 29-30).

Yvonnie Thompson, petitioner's sister, was a reluctant witness.  (TT6, 61).  She testified that Edward Johnigan's street name was "Main."  (TT6, 65).  She also testified that Johnigan was Corey McCollough's friend.  (TT6, 76).  Ms. Thompson had previously testified that Johnigan got lost on his way to Grand Rapids on February 3, 2003.[4]  (TT9, 86).  After McCullough talked to Johnigan on the phone, Johnigan arrived a short time later at her residence.  (Id.).  Johnigan was driving an older model white vehicle.  (Id.).  Petitioner arrived shortly thereafter.  (TT9, 87).  Ms. Thompson had seen McCullough with a .40 caliber Beretta.  (TT9, 88).

When Ms. Thompson appeared as a witness at petitioner's second trial, she provided unresponsive answers to questions by the prosecutor, and she blamed the

---

[4]It is unclear from the record provided to this Court the nature of the proceeding in which Ms. Thompson previously testified.  During his direct examination, Detective E. J. Johnson testified that Ms. Thompson had agreed in December 2003 to provide truthful testimony in exchange for a dismissal of pending embezzlement charges against her.  (TT9, 83-84).  The prosecutor then elicited testimony from Detective Johnson regarding Ms. Thompson's testimony from "January 28, [2004]," including the information in this paragraph.  (TT9, 84, 86-88).

investigating detectives and the prosecutor.[5]  (*See*, *e.g.*, TT6, 55-56, 59-60, 65-66).  Ms.

Thompson tried to avoid answering the question whether she had testified in the past,

then she indicated that she had not been honest in her previous testimony.  (TT6, 69).

Eventually, Ms. Thomson's conduct as a witness resulted in the following

exchange:

> Q   Well, at the preliminary hearing you were asked to come up and take an oath to tell the truth.  Do you remember that much?
>
> A   And I tried to tell them that I didn't know when – before I even got incarcerated, I tried to tell them that I didn't know what was going on.  And then when I got in trouble, and that's when they just, the detectives and stuff, just came up with a lot of stuff for me to do to get out of jail.  And I just wanted to get home to my kids.  But when I was free and on my own free will and testified that I didn't know.  I don't.
>
> Q   Well, I'll put it this way.  I certainly asked you questions and so did the defense attorneys, and you answered them.
>
> A   And, like I said, I'm sorry and – I don't know.  I mean they know already the questions that –
>
> Q   Please stop.  I just want you to answer my questions.  I want you to listen to my question and then answer the question.  The answers you gave under oath, were they true or were they lies?
>
> A   Can I plead the Fifth?  Or do I have that option of pleadin' the Fifth, I mean?
>
> Q   You know you can plead the Fifth on this.
>
> A.   Can I?  I don't know.  I wish I could, because I really don't feel comfortable with you.

_____

[5]Ms. Thompson also testified in September 2004 in petitioner's consolidated trial with McCullough.  (ECF No. 21 at 54-95; ECF No. 22 at 5-15, 25-92).

MR. SCHIEBER:    I think she can, your Honor, the position she's placed herself in.

THE COURT:    Well, I agree she's placed herself in grave danger, it seems to me, of prosecution for perjury, which in a capital case carries a very serious criminal penalty.

THE WITNESS:    I'm just – I want to plead the Fifth.

MR. SCHIEBER:    Let's move on.

BY MR. SCHIEBER.

Q    Who was Mr. Gordon's girlfriend back then?

A    I don't know.

(TT6, 78-79).

Ms. Thompson invoked the Fifth Amendment again in response to the prosecutor's redirect examination asking her whether there was anything in her trial testimony that she wanted to change. (TT6, 86). Subsequent questioning established that Ms. Thompson had visited McCullough in jail on numerous occasions. She had visited him five times in August 2004 alone. (TT6, 87). She testified that she may have been McCullough's girlfriend back in the summer 2002, but she persisted in claiming that she had not been his girlfriend in February 2003. (TT6, 87).

Petitioner was arrested on April 24, 2003. (TT7, 10; TT9, 67). A recording of Detective Jack Smith's interview of petitioner was played for the jury. (TT7, 11-15, 29-31). Petitioner originally denied having any knowledge of the robbery/murder. That changed when petitioner was informed that police could place him in the area based on cell phone tower data and calls that had been made with his phone. (TT9, 43; TT12, 116-17). On February 3, 2003, there had been a total of seventeen phone calls between

Corey McCullough and petitioner.  (TT10, 7).  On February 3, 2003, there were a total of phone 24 calls between Edward Johnigan and McCullough.  (TT10, 7).  No calls had been placed between petitioner and Johnigan.  (TT10, 8).

During cross-examination of Detective Smith, petitioner's attorney attempted to establish that during the taped interview petitioner indicated that he would "put the pieces together" for the police after he had an attorney to make a deal.  (TT9, 66-68).  There is no evidence indicating that petitioner ever made an unequivocal request for counsel.  Further, petitioner did not exercise his right to remain silent.  He elected to spend about four hours speaking to Detective Smith and  the jury heard this recording.  (TT9, 69-70).

The jury heard recordings of petitioner's April 2003 phone calls from jail.  (TT9, 44-55).  During an April 26, 2003, phone call to Charles Newsome, petitioner revealed that three people had been involved.  (TT12, 120-22).  They also discussed the possible criminal penalties that would accompany convictions for armed robbery or being an accessory after the fact.  (TT12, 127).  Petitioner made a phone call to his girlfriend, Ms. Hatcher.  Petitioner told Ms. Hatcher to contact his sister, Yvonnie Thompson.  Ms. Thompson was to be instructed that "brother-in law," a coded reference to Corey McCullough, was to "hold fast" and "don't do shit."  (TT12, 119, 122-24, 134).  Petitioner denied that his reference to dropping off money in a subsequent call to Ms. Thompson was an instruction for her to pay Slick so that he would stop cooperating with the police investigation.  (TT12, 124-25).

Brandon O'Connor was an inmate with the Michigan Department of Corrections. He testified briefly and reluctantly, indicating that in 1999, someone named Peewee had pulled a gun on him and taken some of his drugs, money and jewelry. He stated that petitioner was not the Peewee involved in that incident, although that Peewee, like petitioner, had a cousin named Marchello Sylvester and a girlfriend named Kowana Crawford. (TT8, 77-84). O'Connor testified that duct tape had been placed over his eyes during the incident, but he could not recall whether his hands and feet had been duct taped. (TT8, 77-98).

Edward Johnigan was called by the defense. (TT11, 3). Johnigan had already been convicted of murder for killing French. (TT11, 36-37). He had also been convicted of another murder in Detroit. (TT11, 58). At the time he testified at petitioner's trial, he was serving three life sentences stemming from three different cases. (TT11, 59). Johnigan testified that he could not stand snitches and that he would never be a snitch. (TT11, 136-37). He denied that his testimony was an attempt to "take the fall" for his friend Corey McCullough and petitioner. (TT11, 137, 154-55; TT12, 17-18).

Johnigan supplied a version of events that was favorable to McCullough by indicating that McCullough never came into French's house, and favorable to petitioner by indicating that petitioner had left French's house before Johnigan decided to rob and kill French. (TT11, 35-48, 55-57, 86, 88, 91, 95; TT12, 39).

Johnigan's testimony was unfavorable to petitioner to the extent that it supported much of the prosecution's case by placing petitioner inside French's home on the night French was killed. Johnigan stated that when he drove to Grand Rapids

-19-

on February 3, 2003, he missed his highway exit and got lost.  He needed directions over the phone from Corey McCullough to find his way to Yvonnie Thompson's house. (TT11, 13-14, 93-94).  Johnigan was driving his sister's white Grand Prix.  Johnigan testified that he had heroin and two handguns in the trunk, a .380 caliber and a .40 caliber.  (TT11, 19).  Johnigan testified that he met petitioner on February 3, 2003, at a gas station.  (TT11, 4, 18; TT12, 8).  Johnigan followed petitioner and McCullough to the Meijer store.  (TT11, 22).  Johnigan identified McCullough as the individual shown on the Meijer security video getting out of petitioner's van.  (TT11, 112).  Johnigan testified that they went from Meijer to French's home.  (TT11, 24).

Johnigan denied that the trip that he made with petitioner and McCullough to Ean French's house had been a planned robbery from the outset.  He claimed that it was only after the drug transaction had been completed and McCullough and petitioner were gone that he decided to rob French.  (TT11, 85, 91).  Johnigan testified that he wore gloves while he was inside French's house.  Johnigan made no attempt to explain how his wearing gloves throughout a purported drug deal at French's home would not have aroused suspicion.  (TT11, 114; TT12, 35-36).  None of the murders committed by Edward Johnigan, other than that of French, had involved restraining the victim with duct tape.  (TT11, 126).  Johnigan claimed that he had acted alone when he subdued French by hitting him in the head with a gun, found multiple rolls of duct tape, restrained French with duct tape, stabbed French in the shoulder, conducted an extensive search of French's residence, and shot Ean French with two different

handguns, all of which he completed in a period of an hour to an hour and thirty minutes.  (TT11, 99, 105, 107-08, 115, 121-22, 125, 127-32, 151-53).

The .40 caliber Beretta used to kill French had been provided by Corey McCullough.  McCullough was Johnigan's friend.  Johnigan lied to police when he stated that he bought the gun off the street.  He denied that he had lied in an attempt to protect McCullough, however.  (TT11, 132-34).  Johnigan conceded that the .40 caliber Beretta that the police found at his house was one of the guns used to kill French.  Police did not find the .380. (TT11, 134).  Johnigan claimed that a day or two after murdering French he gave the "dirty" .380 to a "friend," purportedly named "Jake," and Johnigan did not know he where "Jake" lived or even his last name. (TT11, 137-38).

Petitioner elected to testify.  He testified that in February 2003 he was a drug dealer.  (TT12, 44, 101).  He conceded that he had been at French's residence on two occasions before February 3, 2003, and on one of those occasions had helped move French's new big screen TV inside.  (TT12, 49-50, 53-54).  Petitioner testified that the reason he went to French's house with Johnigan and McCullough on February 3, 2003, was for a drug deal, not to rob or kill French.  (TT12, 63, 97, 113, 132, 144).  He testified that he drove the van with McCullough as his passenger and Johnigan followed them in another car from the Meijer store to French's house.  (TT12, 71-74, 110, 143, 151).

Petitioner testified that he went into French's house and that Johnigan came in some time thereafter.  He testified that McCullough did not come inside.  (TT12, 75-

76).   He claimed he witnessed a drug transaction, received a quarter-pound of marijuana as his cut, and then left with McCullough because he was upset that Johnigan and French appeared to be cutting him out of future drug deals.  (TT12, 79-85, 137).  Petitioner denied having had anything to do with French's death.  (TT12, 98).

After the close of proofs, the attorneys delivered their closing arguments.  (TT13, 3-105).  Petitioner's attorney made a single objection during the prosecutor's closing argument to the effect that the prosecutor had misrepresented Brandon O'Connor's testimony regarding whether petitioner was the "Peewee" who had robbed O'Connor. (TT13, 44).  Judge Johnston overruled the objection.  He reminded the jury that attorney arguments were not evidence.  The prosecutor was entitled to argue his theory of the case.  (*Id.*).

There were no objections made during petitioner's attorney's closing argument. (TT13, 49-79).  Petitioner's attorney argued that, although the prosecutor had presented evidence that placed petitioner at Ean French's house earlier in the evening on the night of the murder, he had not presented sufficient evidence to prove beyond a reasonable doubt that petitioner was present when French was murdered.  He also emphasized the lack of evidence placing a gun in petitioner's hand.  He offered arguments that the jury should believe the testimony of Johnigan and petitioner.

Petitioner's attorney also provided a lengthy explanation as to why petitioner had elected against telling the whole story to Detective Smith.  (*See* TT13, 77-78). Petitioner's attorney's closing argument concluded with a request that petitioner be found not guilty.  (TT 13, 79).

-22-

The prosecutor delivered his rebuttal. (TT13, 79-105). Petitioner's attorney made six objections that the prosecutor was straying beyond the scope of the defense closing argument. His objections were not sustained. (TT13, 95, 98-103). There were no objections to the prosecutor's arguments that petitioner and Johnigan were not telling the truth. (TT13, 5, 79). The prosecutor responded to defense counsel's arguments that the jury should accept petitioner and Johnigan's respective testimony by exploring their motives for lying. For example, the prosecutor highlighted that Johnigan had nothing to lose in providing testimony claiming that he had acted alone when he decided to rob and kill Ean French: "What about Mr. Johnigan? He is right now serving three life sentences for three separate cases. Life has less mystery for him than a lot of people. He doesn't know when he's gonna die, but he knows where. He's 35 years old and he's already spent 19 years of his adult life in prison." (TT13, 83). Defense counsel did not object to the brief rebuttal addressing the defense argument that petitioner knew there had been a murder, but did not want to tell Detective Smith the whole story until after he had worked out a deal through an attorney. (TT13, 99).

Judge Johnston delivered the jury instructions. (TT13, 105-25). Petitioner's attorney objected to the fact that an accomplice instruction had been given. (TT13, 127-28). Judge Johnston overruled the objection:

> The instruction is based on the standard instructions, CJI 2nd 5.4 and 5.7. As defined in 5.4, Mr. Johnigan is an undisputed accomplice, and, as indicated under the use notes, under 5.6 the instruction, while it's generally used where the prosecutor brings in an accomplice to testify against the co-defendant, may, in fact, be tailored to be used where a defendant brings in an accomplice or co-defendant to testify on behalf of the defense. There is significant material in the use note to that effect and a helpful citation to the Court of Appeals Opinion in *People v.*

> *Heikkinen*, H-E-I-K-K-I-N-E-N, 250 Mich App 322, 2002, a case in which
> the Michigan Supreme Court denied leave to appeal. The court basically
> followed the directives in that case and in the use notes in formulating
> the specific instruction given and indicated to counsel ahead of time that
> it would do so.

(TT13, 128).

On the afternoon of November 4, 2004, the court was presented with two jury

questions. The first question: "What was Johnigan's statement regarding

McCullough's sentence." (TT14, 5). Judge Johnston gave the following response: "The

answer is I don't have any idea. I don't remember what he may have said in that

regard or if he said anything in that regard. And I guess the reason is that if he did

I don't know that I would have regarded it as terribly important. I can tell you this.

Mr. McCullough has not been sentenced in this case, therefore there is no sentence

about which to comment." (TT14, 5). Judge Johnston offered to replay the testimony

of Johnigan, or any other witness, if the jury wanted to review it. (TT14, 5-6).

Petitioner's attorney acknowledged that it was petitioner's witness, Johnigan,

who brought up that McCullough was convicted. Petitioner's attorney had no objection

to the judge's response to the jury's question. (TT14, 7-8). Further, Judge Johnston

noted for the record that he had never indicated to the jury that McCullough had been

convicted of anything. (TT14, 8).

The second question came in late in the day: "If a juror cannot come to a

decision on a charge, can that juror just be excused." (TT14, 9). Judge Johnston

replied that the answer was no. He observed that this note was unclear whether the

juror could not make up his or her mind or whether the juror was having difficulty on

-24-

one charge as opposed to another charge.   The judge concluded proceedings for the day, but encouraged the jurors to continue working in good faith to arrive at a verdict when they returned.  (TT14, 9-12).

The next day was a Friday, and in the early afternoon, the jury sent a note indicating that they could not reach a verdict.  Judge Johnston reassured jurors that he would do everything he could to accommodate their schedules and deal with any problems or concerns regarding their employers.  He elected to excuse the jury at 12:55 p.m.  He encouraged jurors to continue discussing matters and to deliberate when they returned on Monday.  There were no objections to the judge's delivery of this standard jury instruction.  (TT15, 3-9).

On the following Monday, shortly after the jury had reconvened, the judge received a note stating: "Need to break until 1:00 p.m." (TT16, 14).  There were no objections to granting this request, and at 9:49 a.m. the jury was excused until 1:00 p.m. (TT16, 15).  Judge Johnston gave absent Juror 9 more than a full hour after the 1 p.m. deadline to return.  He reconvened court at 2:06 p.m. to address the course of action that would be taken in light of the juror's departure:

> Looks like juror in Seat # 9 evidently took off her juror badge and turned it in at the jury clerk's office and more or less seceded from the jury.  She called the Court over the noon hour and left a recorded message which counsel and I have listened to.  In the message she essentially says it's been a long, hard trial and it's been very stressful, that it's ruining her health and that she's sorry, but she just can't go on, that she can't come back, that she can't do this anymore. And I think in three different ways she reiterated that she's not coming back.

(TT16, 15).

Judge Johnston discussed the matter on the record with all counsel present. The prosecution suggested that an alternate be seated, finding significant that Juror

9 had not indicated her vote.   Petitioner's counsel objected and requested that the

Juror 9 be brought before the court and questioned.   Judge Johnston overruled the

objection:

> Well, I guess I'm of the opinion that to bring [Juror 9] back would simply
> be counterproductive.  If I thought by bringing her back and holding
> hands with her we could woo her back to the process, I'd say let's do it.
> But if we bring her in here by force and against her will, I just don't see
> her as being a productive deliberating participant in the process.  I think
> she seceded from the panel, lawfully or not, and I think we have to accept
> that as a fete accompli.  So to the extent that you want us to go round her
> up and drag her back, I'm disinclined to do that.

(TT16, 21).

The court secured the attendance of the two alternate jurors and confirmed on

the record that they had abided by the court's instructions by not discussing the case

or otherwise contaminating themselves in any way.  One of the alternates was selected

through a random draw process and seated.  (TT16, 22-29).

Petitioner's attorney noted for the record that he continued to object to the

court's decision against bringing back Juror 9 and questioning her in court.  Counsel

had no objection to the steps that the court had taken in the process of seating an

alternate juror.   (TT16, 29-30).   Judge Johnston noted for the record that the

communications that Juror 9 had provided reinforced his decision against forcibly

compelling her to come back to court:

> All right.  Well again, as I said earlier, I thought because she had very
> vociferously indicated she did not want to be part of the jury any longer
> and that it was ruining her health, it seemed to me that having [Juror 9]
> return was simply not productive or really even possible.  I do note that
> I have another message here from Gail VanTimmermen, the jury clerk,
> saying that she had heard, I'm not sure if it's the same message we heard
> or another message, she may have left voice messages in both places

-26-

saying that "she doesn't want to return and she feels she will have a nervous breakdown", and she's saving the message.  So I think once a juror has taken that position that it's counterproductive to attempt to proceed further.  Even if we brought her back and grilled her and then put her back in the jury room, I don't think we can expect any reasonable participation at this stage.

(TT16, 30-31).

The jury was instructed to commence its deliberations anew because an alternate juror had been seated.  (TT16, 32-33).

On November 9, 2004, the jury found petitioner guilty of second-degree murder.[6] (TT17, 3-4).  On January 25, 2005, Judge Johnston sentenced petitioner as an habitual offender to 60 to 99 years' imprisonment, his sentence to run "consecutively with the two-year sentence and the one-to-twenty years sentence for which [he was] on parole at the time of [his] arrest."  (Sentencing Transcript at 34, ECF No. No. 54; *see* Judgment of Sentence Commitment to Department of Corrections, copy found in Michigan Court of Appeals Record, ECF No. 55).

## B.   Subsequent Proceedings

Petitioner filed an appeal in the Michigan Court of Appeals.  He was represented by appellate counsel who argued that petitioner's conviction should be overturned on the same issues raised in the pending habeas grounds I through IV.  (Statement of Questions Presented, Defendant-Appellant's Brief at vii-viii, found in Michigan Court

---

[6]Judge Johnston noted that the alternate juror that had been seated was an African American female who had taken copious notes throughout the trial.  When this alternate had been seated in place of Juror 9, the ethnic balance of the jury was not disturbed.  The jury that found petitioner guilty included three African American females.  (TT17,10).

of Appeals Record, ECF No. 55).  On August 12, 2008, the Michigan Court of Appeals affirmed petitioner's conviction.  (8/12/08 Op., ECF No. 55; *People v. Gordon*, No. 261724, 2008 WL 3349072 (Mich. Ct. App. Aug. 12, 2008).

On November 14, 2008, petitioner filed his application for leave to appeal in the Michigan Supreme Court.  Petitioner raised the four issues that had been raised by his appellate counsel.  On April 8, 2009, Michigan Supreme Court denied leave to appeal. (ECF No. 57).

On June 5, 2009, petitioner filed his federal habeas corpus petition.  (ECF No. 1)

Petitioner filed a Rule 6.500 motion in the Kent County Circuit Court seeking postconviction relief.  On November 18, 2009, Judge Johnston entered an opinion and order denying petitioner's motion for relief from judgment.  (ECF No. 59). Petitioner had argued "(i) that evidence of his exercise of his right to remain silent was improperly introduced at trial; (ii) that the prosecutor engaged in improper final argument; (iii) that it was improper to state that co-defendant Corey McCullough ('McCullough') had not yet been sentenced; (iv) improper admission of demonstrative evidence; (v) improper accomplice instructions; (vi) that a prosecution witness who attempted to assert a [F]ifth [A]mendment right continued to testify; (vii)  that it was error for the Court not to give a specific instruction on conspiracy; (viii) that conspiracy to commit second-degree murder is not an actual crime; (ix) that OV-6 was improperly scored; and (x) that he was denied effective assistance of trial and appellate counsel; and that the effect of these errors was to deny him a fair trial."  (Opinion & Order at 1, ECF No. 59).  Judge Johnston found that these issues had been defaulted because

petitioner did not raise them on direct appeal: "Defendant is not entitled to relief because he has failed to show good cause for not raising these issues in his prior appeals, nor has he demonstrated actual prejudice as required by MCR 6.508(D)(3)." (Opinion & Order at 1).

Judge Johnston applied the standard the Supreme Court established in *Strickland v Washington*, 466 U.S. 668 (1984), and rejected petitioner's claim of ineffective assistance of appellate counsel. The judge noted that appellate counsel had raised four issues on direct appeal, one of which had prompted one of the appellate judges to write a dissent. The judge also noted that appellate counsel was not required to raise every arguable claim, and petitioner had not demonstrated any prejudice attributable to the omission of the issues petitioner later raised in his *pro se* Rule 6.500 motion. Judge Johnston found that petitioner failed to establish ineffective representation or prejudice. As a result, the claims that he raised in his 6.500 motion were "procedurally barred due to [petitioner's] failure to establish 'good cause' as required by MCR 6.508(D)(3)." (Opinion & Order at 3, ECF No. 59).[7]

Judge Johnston found that petitioner failed to demonstrate actual prejudice. The judge agreed with the appellate finding that there had been sufficient evidence presented at trial to support the jury's finding that petitioner was guilty of second-degree murder, either on the basis that petitioner "committed or aided and abetted the

---

[7]A photocopying error resulted in the omission of the third page of Judge Johnston's Opinion and Order from the Rule 5 materials from the Michigan Court of Appeals. The third page of the Opinion and Order is found in the Michigan Supreme Court record. (ECF No. 59).

murder of French." (*Id.* at 3).   Judge Johnston conducted an examination of petitioner's claims and found that there was no prejudice or miscarriage of justice to correct because petitioner's claims lacked merit. (*Id.*).   There had been no violation of petitioner's rights by the introduction of the recording of the interview with Detective Smith.  Although the jury learned through the recording that at some point petitioner had invoked his right to remain silent, petitioner continued to speak and denied any involvement in the killing of French.   Further, the prosecutor never highlighted petitioner's invocation of his right to remain silent or used it against him in any way. (Opinion & Order at 4, ECF No. 58).

Judge Johnston found that there was no prosecutorial misconduct in closing argument.   Argument that the testimony of petitioner and Johnigan were "liars" because their testimony was not credible fell within the range of permissible argument. The prosecutor may comment on testimony and "may argue from the facts and evidence a witness, including the defendant, is not worthy of belief." (*Id.*) (citing *People v. Viaene*, 326 N.W.2d 607 (Mich. Ct. App. 1982)).

Judge Johnston found meritless petitioner's claim that the court had erred in informing the jury that petitioner's co-defendant McCullough had not yet been sentenced.  The information had been provided in response to jury question asking "[w]hat was Johnigan's statement regarding McCullough's sentence."  The Judge responded: "The answer is I don't have any idea.  I don't remember what he may have said in that regard.  And I guess the reason is that if he did I don't know that I would have regarded it as terribly important.  I can tell you that Mr. McCullough has not yet

-30-

been sentenced in this case, therefore there is no sentence about which to comment." The jury had been informed of McCullough's involvement through the testimony of petitioner's witness, Edward Johnigan. Further, any error that may have occurred was harmless in light of the weight of the evidence of petitioner's guilt. (Opinion & Order at 4-5).

Judge Johnston found no merit to petitioner's argument that the admission of evidence seized from Johnigan's home, including weapons and ammunition, had been improper. "The Court ruled on the relevance of the offered evidence at trial pursuant to defense counsel's objection, noting that although the evidence seized from Johnigan's home and not linked to Defendant directly, 'the evidence which may characterize the nature of Mr. Johnigan's business and lifestyle to the extent that it connects ultimately with Mr. Gordon is germane.' " (*Id.* at 5).

Judge Johnston rejected petitioner's assertion that it erred in not specifically instructing the jury that it had the option of acquitting him based on Johnigan's testimony. Petitioner's jury received the standard jury instructions that he could only be convicted on the basis of proof beyond a reasonable doubt that he had committed the crime. Petitioner "failed to provide any evidence that the result would have been different if the judge had given a more specific instruction." (*Id.*).

Judge Johnston found no error in the scoring of OV-6 under Michigan's sentencing guidelines. "[T]here was ample evidence to support the Court's finding that [petitioner] and his co-defendants acted with intent to kill and that scoring at the upper end of the guidelines was proper." (*Id.* at 6).

Judge Johnston applied the *Strickland* standard and rejected petitioner's claims of ineffective assistance of trial counsel. Petitioner "failed to show that his trial counsel's performance fell below an objective standard of reasonableness[.]" The trial court noted that counsel's performance had secured a hung jury in petitioner's first trial. Petitioner had not demonstrated prejudice stemming from counsel's purported errors. Petitioner "failed to demonstrate ineffective assistance of counsel at either the trial or appellate level." (Opinion & Order at 6).

Judge Johnston's rejected all the remaining arguments that petitioner had raised in his motion for relief from judgment:

> Finally, Defendant next alleges several errors which are nonsensical and, at a minimum, have no factual or legal grounds. Defendant argues it was improper that a prosecution witness who attempted to assert a Fifth Amendment right continued to testify, yet a witness may only invoke such a privilege to avoid self-incrimination. The Fifth Amendment does not protect the witness from perjury. Since the witness was not deprived of any constitutional rights, there was no error. In addition, defendant argues that the Court should have given a specific instruction related to the crime of conspiracy. However, defendant was convicted of murder, not conspiracy, and the Court is not required to give *sua sponte* instructions that were not requested. Defendant also asserts that his conviction was more than likely based on the prosecutor's original charge of conspiracy and that conspiracy to commit second degree murder is not an actual crime in Michigan. This argument is without merit. Defendant was convicted of second-degree murder and there is no reason to assume that such conviction was based on a charge of conspiracy and the fact that conspiracy to commit second degree murder is not an offense in Michigan is irrelevant and illogical.

(*Id.*).

Judge Johnston's opinion concluded as follows: "Defendant failed to show good cause as to why the above issues were not raised on appeal and he has not

demonstrated actual prejudice.   Consequently, his claims are procedurally barred under MCR6.508(D)(3)."  (Opinion & Order at 7).

On March 17, 2010, the Michigan Court of Appeals denied petitioner's application for leave to appeal.  (3/17/10 Order, ECF No. 58).  On July 26, 2010, the Michigan Supreme Court denied petitioner's application for leave to appeal.  (7/26/10 Order, ECF No. 59).

On September 23, 2010, he filed his first amended petition.  (ECF No. 7).  On October 13, 2010, he filed his second amended habeas corpus petition.  (ECF No. 11). On May 19, 2014, the Court entered an order granting petitioner's motion for leave to file a third amended petition.  (ECF No. 71).

## Discussion

### I.   Grounds Rejected By the Michigan Court of Appeals

#### A.   *Batson* Issue

In Ground I, petitioner argues that the prosecutor's race-neutral reasons for dismissing minority (i.e. African American and Hispanic) jurors were insufficient to avoid a finding of purposeful discrimination in the exercise of peremptory challenges. Further, the trial court's finding that the reasons were adequate was clearly erroneous and the trial court's rejection of the defense claim was an abuse of discretion.  (Third Amended Petition at 5, ECF No. 73, PageID.914; Petitioner's Brief at 2-6, ECF No. 74, PageID.925-29).

In *Batson v. Kentucky*, 476 U.S. 79, 96, (1986), the Supreme Court articulated a three-step analysis to be applied to an Equal Protection Clause claim that purposeful

discrimination occurred in the selection of the petit jury based solely on the prosecutor's exercise of his peremptory challenges at trial. *See Purkett v. Elem*, 514 U.S. 765, 767 (1995). First, the defendant must establish a prima facie case of racial discrimination. *Id.* at 767. "[T]he defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' " *Batson*, 476 U.S. at 96 (quoting *Avery v. Georgia*, 345 U.S. 559, 562 (1953)). Ultimately, petitioner must "raise an inference that the prosecutor used [a peremptory challenge] to exclude the veniremen from the petit jury on account of their race." *Id.*; *see Johnson v. California*, 545 U.S. 162, 168 (2005).

Second, once the defendant has raised the necessary inference, "the burden shifts to the state to come forward with a neutral explanation for challenging [potential] jurors." 476 U.S. at 97; *see Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016). "The government is not required to persuade the court that its reasons for dismissing the juror were well-founded; rather it need only demonstrate that its reasons were race-neutral." *United States v. Copeland*, 321 F.3d 582, 599 (6th Cir. 2003). More specifically, "[t]he second step of this process does not demand an explanation that is persuasive or even plausible. 'At this ... step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett v. Elem*, 514 U.S. at 767-68 (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991)).

Third, the court must determine "whether the defendant has carried his burden of proving purposeful discrimination."[8] *Hernandez*, 500 U.S. at 359. In making this determination, the Court presumes that the facially valid reasons proffered by the prosecution are true. *Id.* at 359-60. Racially discriminatory purpose or intent must be affirmatively shown by the opponent of the strike. *Id.* at 360. The ultimate burden of persuasion always remains with the opponent of the strike. *See Johnson v. California*, 545 U.S. at 171; *Purkett v. Elem*, 514 U.S. at 768.

"[A] trial court finding regarding the credibility of the attorney's explanation on the ground for a peremptory challenge is entitled to great deference. On direct appeal, those findings may be reversed only if the trial judge is shown to have committed clear error. Under AEDPA, even more must be shown. A federal habeas court must accept the state-court finding unless it was based on 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' § 2254(d)(2). 'State court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence.' § 2254(e)(1)." *Davis v. Ayala*, 135 S. Ct. 2187, 2199-2200 (2015) (citations and quotations omitted); *see also Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). Further, because the Michigan Court of Appeals rejected petitioner's *Batson* claim, he "cannot obtain federal habeas

---

[8]Notwithstanding this three-part test, however, the Supreme Court has held that the question of whether a prima facie case has been established becomes moot once a court rules on the ultimate question under *Batson* of whether there was purposeful discrimination. *Hernandez*, 500 U.S. at 359. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court had ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Id.*

corpus relief under § 2254(d)(1) unless he can show that the decision of the [Michigan Court of Appeals] 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.'" *Thaler v. Haynes*, 559 U.S. 43, 46 (2010).

The Michigan Court of Appeals recited the *Batson* standard and thoroughly analyzed the factual record, applying the facts to the *Batson* standard:

> [Defendant] challenges three of the prosecutor's peremptory challenges: Venireperson Patterson, a male African-American; Venireperson Jones, a female African American; and Venireperson Cardenas, a female Hispanic.

> After defense counsel objected to the prosecutor's peremptory dismissal of these jurors, the trial court required the prosecution tender neutral explanations for their removal. The prosecutor explained that he removed Venireperson Patterson because he did not respond (by nodding like the other panel members) to the prosecutor's first question on voir dire. The prosecutor also explained:

> > ... I apologize to him for this, but he doesn't appear very smart. I was over there asking the question about decision making and [he was] rambling and it went on and on and I'm physically over near him and Ms. Cardenas is right in front of me and she was rolling her eyes at some point about his answer.

> In regard to Venireperson Cardenas, the prosecutor explained that:

> > her boyfriend got arrested and she very obviously reacted to that. Her eyes welled up and she was obviously close to tears. At one point I asked her if she was all right. That an arrest situation, it's a big issue with her, it's an issue with me and so she's gone.

> In regard to Jones, the prosecutor explained that: "Ms. Jones because I thought of the remaining jurors she was one most likely to be, in part because she had just too many contacts with relatives in the criminal justice system for me to perfectly (sic) at ease with her."

We conclude the prosecutor's explanations of his peremptory challenges were racially-neutral and adequate. . . .

Also, there is evidence that Venireperson Patterson's answer to the prosecutor's question was "not really responsive" and that other jurors audibly groaned at Venireperson Patterson's lengthy and irrelevant response. The trial court did not err in finding this explanation for a peremptory challenge both racially-neutral and adequate. Further, that Venireperson Cardenas became emotional with the mention of the arrest of her boyfriend is plainly a racially-neutral and adequate explanation of potential bias against the prosecution, and permissible justification for a peremptory challenge. Last, Venireperson Jones' contacts with police presented potential juror bias in this case. The prosecution's theory was largely based on the jury accepting circumstantial evidence presented by police. The prosecution clearly intended to prevent seating a juror that did not accept this evidence simply based on a juror's negative prior contacts with police. The trial court properly held that the prosecution explanation for its peremptory challenges both racially-neutral and adequate.

2008 WL 3349072, at * 19-20.

The trial court and the Michigan Court of Appeals each correctly found that the prosecutor's explanations were facially race-neutral and therefore valid. *See Purkett v. Elem*, 514 U.S. at 768-69. The reasons were unrelated to the prospective jurors' race. They were tailored to the specific responses offered to questions presented in voir dire. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. at 360. The prosecutor's explanations satisfied equal protection guarantees as a matter of law. Petitioner has not satisfied his burden to overcome the trial court's factual finding. *See Davis v. Ayala*, 135 S. Ct. at 2199-2200.

Further, petitioner has not shown that the decision of the Michigan Court of Appeals rejecting his *Batson* claims "(1) resulted in a decision that was contrary to, or

-37-

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

B.   Evidentiary Ruling

In Ground II, petitioner argues that Judge Johnston's ruling allowing evidence of the robbery of Brandon O'Connor was an abuse of discretion and denied petitioner's right to a fair trial.   (Third Amended Petition at 5, ECF No. 73, PageID.914; Petitioner's Brief at 7-11; ECF No. 74, PageID.930-34).

The extraordinary remedy of habeas corpus lies only for a person held in custody in violation of the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68 (citations and quotations omitted).  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68; *accord Swarthout v. Cooke*, 562 U.S. 216, 219-21 (2011).

Petitioner has not shown that the admission of this evidence resulted in a federal due process violation.  "A due process claim premised on a mistaken state court evidentiary ruling faces a steep climb.  The kind of foundational unfairness and

arbitrariness needed to show that a flawed evidentiary ruling rises to the level of a due process violation is not a broad category[.]" *Burger v. Woods*, 515 F. App'x 507, 510 (6th Cir. 2013). Garden variety claims that the trial court misapplied Michigan Evidence Rule 404(b) do not "cross the constitutional threshold of due process." *Burger*, 515 F. App'x 510 (citations and quotation omitted). State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000); *accord Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

O'Connor was a minor witness who gave brief testimony during a lengthy trial. His testimony tended to show that petitioner used duct tape to secure his victims, which contradicted petitioner's and Johnigan's testimony that Johnigan alone robbed and killed French. O'Connor's testimony did not render petitioner's trial fundamentally unfair. The jury could have disregarded this evidence and, nonetheless, found petitioner guilty. Among other things, petitioner's own testimony placed him at French's house on the night that French was killed. The physical evidence, including the fact that the victim was killed by shots fired from two different caliber handguns, seriously undermined the defense theory that Johnigan had acted alone. The jury necessarily determined that the testimony provided by Johnigan and petitioner was not credible.

The Michigan Court of Appeals rejected petitioner's argument that the trial court committed error and violated his constitutional rights in admitting O'Connor's testimony.  There is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence.  In *Estelle*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process.  *Estelle*, 502 U.S. at 75. The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime.  *Id.* at 75 n.5.

While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.  The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512.  The decision of the Michigan Court of Appeals rejecting petitioner's claim was not "contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

C.     Sufficiency of the Evidence

In Ground III, petitioner argues that the evidence presented at trial was insufficient to support the jury's verdict finding him guilty of second-degree murder. (Third Amended Petition at 5, ECF No. 73, PageID.914; Petitioner's Brief at 12-22, ECF No. 74, PageID.935-45).   A section 2254 challenge to the sufficiency of evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*; *see Cavazos v. Smith*, 132 S. Ct. 2, 3-4 (2011) (*per curiam* ) (*Jackson v. Virginia* "makes clear that it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial.").   Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n. 16; *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011).

The Michigan Court of Appeals ruled directly on this claim.  Review of this issue must be conducted under the AEDPA standard, which the Sixth Circuit has described as "very deferential."  *Durr v. Mitchell*, 487 F.3d 423, 448 (6th Cir. 2007).  Review of challenges to the sufficiency of evidence under the *Jackson v. Virginia* standard

proceeds under the "unreasonable application" prong of AEDPA.  *See Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008).  Such an argument is properly understood as an allegation that the state court's decision resulted in an unreasonable application of *Jackson v. Virginia. See Eady v. Morgan*, 515 F.3d 587, 601-02 (6th Cir. 2008).  Review in such cases "is limited to determining whether the evidence was so overwhelmingly in favor of the petitioner that it compelled a verdict in his or her favor."  *Thompson v. Bock*, 215 F. App'x 431, 436 (6th Cir. 2007).  This standard presents a "nearly insurmountable hurdle" for the habeas petitioner.  *Davis v. Lafler*, 658 F.3d at 534. "Adding to this extremely high bar are the stringent and limiting standards of AEDPA."  *Id.*

The Sixth Circuit has summarized the "double layer of deference" given the state-court decisions in the context of sufficiency-of-the-evidence claims:

> First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979).  In doing so, we do not re-weigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993).  Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution.  Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable.

*Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

-42-

The Michigan Court of Appeals held that the evidence at trial was sufficient to support the jury's verdict finding petitioner guilty of second-degree murder. *See* 2008 WL 3349072, at *22-23. Habeas corpus review does not involve re-weighing the evidence, re-evaluating the credibility of witnesses, or substituting this Court's judgment for that of the jury. *See Johnson v. Mitchell*, 585 F.3d 923 (6th Cir. 2009). Here, the Michigan Court of Appeals articulated the appropriate standard under *Jackson v. Virginia*, citing state cases adopting this standard. The decision of the Michigan Court of Appeals finding that there was sufficient evidence to support the jury's verdict finding petitioner guilty of second-degree murder was not an unreasonable application of the *Jackson v. Virginia* standard. 28 U.S.C. § 2254(d)(1).

D.   Replacement of Absent Juror

In Ground IV, petitioner argues that the trial court's replacement of an absent juror with an alternate juror was an abuse of discretion, which violated his Sixth Amendment rights. (Third Amended Petition at 5, ECF No. 73, PageID.914; Petitioner's Brief at 23-26, ECF No. 74, PageID.946-949). The Michigan Court of Appeals rejected this claim. *See* 2008 WL 3349072, at *23-24.

Petitioner has not shown that the decision of the Michigan Court of Appeals rejecting his claim based on the seating of the alternate juror was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

-43-

"[The Supreme Court has not yet specifically ruled on the constitutionality of substituting an alternate juror after jury deliberations have begun." *Claudio v. Snyder*, 68 F.3d 1573, 1575 (3d Cir. 1995); *see also Dean v. Woods*, No. 2:15-cv-13911, 2016 WL 4537863, at *5 (E.D. Mich. Aug. 31, 2016).  This novelty alone is fatal to petitioner's habeas corpus claim because he cannot possibly demonstrate a violation of clearly established Supreme Court precedent.[9]  *See Premo*, 562 U.S. at 127; *see also Woods v. Donald*, 135 S. Ct. at 1377.

"In addition, petitioner is not entitled to habeas relief on this claim because he has presented no evidence to this Court that the alternate juror was actually biased or had been subjected to extrinsic influences." *King v. Berghuis*, No. 07-12011, 2010 WL 3515775, at *7 (E.D. Mich. Sept. 8, 2010).  There was no evidence that the alternate juror was biased, and the trial court record establishes that the alternate juror seated had not been subjected to extrinsic influences and the jury was instructed to begin deliberating anew.  *See Moore v. Patton*, No. 12-cv-173, 2015 WL 1246053, at *14 (N.D. Okla. Mar. 18, 2015).

## II.    Procedural Default

"Federal habeas courts generally refuse to hear claims 'defaulted ... in state court pursuant to an independent and adequate state procedural rule.'" *Johnson v.*

---

[9]Although a violation of clearly established Supreme Court authority is required for habeas corpus relief under 28 U.S.C. § 2254(d)(1), it is nonetheless appropriate to note that most federal courts that have addressed the issue have held that the "substitution of an alternate juror in place of a regular juror after deliberations have begun does not violate the Constitution, so long as the judge instructs the reconstituted jury to begin its deliberations anew and the defendant is not prejudiced by the substitution." *Claudio*, 68 F.3d at 1575-76.

*Lee*, 136 S. Ct. 1802, 1803-04 (2016) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750, (1991)).  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.[10]  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether:  (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim; and (4) the petitioner has shown "cause and prejudice" to excuse the procedural default.  *See Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (*en banc*).  In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim.  *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d at 291.

### A.   Failure to Raise Grounds V through XII on Direct Appeal

Petitioner first raised Grounds V through XII in a motion for relief from judgment.  Both the Michigan Court of Appeals and the Michigan Supreme Court denied petitioner's applications for leave to appeal under MCR. 6.508(D).  In *Guilmette*

---

[10]"A State's procedural rules are of vital importance to the orderly administration of its criminal courts; when a federal court permits them to be readily evaded, it undermines the criminal justice system." *Johnson v. Lee*, 136 S. Ct. at 1807 (quoting *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)).  "[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman*, 501 U.S. at 732.

*v. Howes*, the Sixth Circuit held that brief form orders by the Michigan appellate courts invoking Mich. Ct. R. 6.508(D) are unexplained orders within the meaning of *Ylst v. Nunnemaker*, 501 U.S. at 803.  Such form orders are presumed to uphold or reject the last reasoned decision below.  *Guilmette*, 624 F.3d at 291-92.

The trial court held that review was barred under Mich. Ct. R. 508(D)(3), and it denied petitioner's motion for relief from judgement.  Under Mich. Ct. R. 6.508(D)(3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised on direct appeal. For a claim that could have been raised in a previous appeal, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand."  MICH. CT. R. 6.508(D)(3)(a)-(b).

"State rules count as 'adequate' if they are 'firmly established and regularly followed.' "  *Johnson v. Lee*, 136 S. Ct. at 1804 (quoting *Walker v. Martin*, 562 U.S. 307, 316 (2011)).  Michigan's rule requiring that claims of error be raised in a timely fashion on direct appeal is firmly established and regularly followed.[11]  It is  an adequate and

_____

[11]"The general rule in federal habeas cases is that a defendant who fails to raise a claim on direct appeal is barred from raising the claim on collateral review. Likewise, state postconviction remedies generally may not be used to litigate claims which were or could have been raised at trial or on direct appeal.  It appears that every State shares this procedural bar in some form."  *Johnson v. Lee*, 136 S. Ct. at 1805 (citations and internal quotations omitted).

The Supreme Court's recent decision in *Johnson v. Lee* emphasized that a state court's exercise of its discretion in denying a claims on the merits despite defaults in failure to raise issues on direct appeal did not show that the procedural rule was not

independent state ground for the purpose of the procedural default doctrine.  *See Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005); *see also Manoku v. Bauman*, No. 15-2039, 2016 WL 418408, at *4 (6th Cir. Feb. 4, 2016) ("This court has [] recognized that enforcement of MCR 6.508(D)(3) constitutes 'an independent and adequate state ground sufficient for procedural default.'") (quoting *Ames v. Renico*, 683 F.3d 720, 733 (6th Cir. 2012)).

"Ordinarily, violation of 'firmly established and regularly followed state rules' will be adequate to foreclose review of a federal claim.  There are, however, exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. 362, 375-76 (2002).  This case falls well within the general rule and outside the narrow exception recognized by the *Kemna* decision.  *See* 534 U.S. at 387 (summarizing the combination of special circumstances necessary to fall within the "small category" of cases within the narrow exception to the general rule).

The Court finds that the State of Michigan had a firmly established rule of procedural bar in place, that petitioner violated the rule, and that the state court relied upon petitioner's violation of those rules.  Petitioner is therefore barred from maintaining the grounds asserted in the petition, unless he bears the burden of

---

regularly followed.   "[A] state procedural bar may count as an adequate and independent ground for denying a federal habeas petition even if the state court had discretion to reach the merits despite the default." *Johnson v. Lee*, 136 S. Ct. at 1806 (quoting *Walker v. Martin*, 562 U.S. 307, 311 (2011)).

showing both cause for and prejudice from the procedural default or a fundamental miscarriage of justice.

      B.    <u>Cause and Prejudice</u>

If a petitioner procedurally defaulted his federal claims in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986). The miscarriage-of-justice exception can be met only in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

      1.    Cause

Ineffective assistance of counsel can constitute "cause" in the procedural default context. *See Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). The Supreme Court emphasized in *Edwards v. Carpenter* that not just any deficiency in counsel's performance will suffice to establish cause:

> Although we have not identified with precision exactly what constitutes "cause" to excuse procedural default, we have acknowledged that in certain circumstances counsel's ineffectiveness in failing to preserve the claim for review in state court will suffice.  Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution.  In other words, ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim.

*Id.* at 451-52.

The Court has assumed for analytical purposes that petitioner is claiming that ineffective assistance of appellate counsel constitutes cause to excuse his procedural defaults.[12]  Ineffective assistance of appellate counsel "may constitute cause for procedural default, but only if it is constitutionally ineffective under the standard established in *Strickland v. Washington*, 466 U.S. 668 (1984)."  *Howard v. Bouchard*, 405 F.3d 459, 478 (6th Cir. 2005) (citing *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986)); *see Wade v. Timmerman-Cooper*, 785 F.3d 1059, 1077 (6th Cir. 2015).

Petitioner's argument that his appellate counsel should have raised additional issues in the Michigan Court of Appeals (Petitioner's Brief at 51-53, ECF No. 74, PageID.974-76) falls short of establishing cause to excuse petitioner's procedural defaults.  Claims of ineffective assistance of appellate counsel are measured under the *Strickland* standard.  *Evitts v. Lucey*, 469 U.S. 387 (1985).  Petitioner must prove (1) that appellate counsel's performance fell below an objective standard of reasonableness

---

[12]Respondent is correct that the *pro se* petitioner did not argue that ineffective assistance of appellate counsel was "cause" to excuse his procedural defaults. Petitioner ignored the procedural default issue.  (*See* Petitioner's Brief at 27-56, ECF No. 74, PageID.950-79).

and (2) that counsel's deficient performance prejudiced defendant resulting in an unreliable or fundamentally unfair outcome.  466 U.S. at 687-88.  "In the appellate counsel context, counsel's failure to raise an issue on direct appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal."  *Wade v. Timmerman-Cooper*, 785 F.3d at 1077 (citation and quotation omitted).

In adjudicating the first prong of the standard, the Court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.  The Court should recognize that counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 690.  The Sixth Amendment is violated only if counsel's acts or omissions "were outside the wide range of professionally competent assistance."  *Id.*  Strategic choices after thorough investigation of law and facts relevant to plausible options are "virtually unchallengeable."  *Id.*

In the case of appellate counsel, petitioner has no constitutional right to have had every nonfrivolous issue raised on appeal.  *Jones v. Barnes*, 463 U.S. 745 (1983).  Tactical choices regarding issues on appeal are properly left to the sound judgment of counsel.  *See United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).  " 'Winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. at 751-52)).

Petitioner's appellate counsel raised four issues on direct appeal and those issues have already been addressed herein. Petitioner argues that appellate counsel was constitutionally ineffective because he failed to raise additional claims that petitioner raised in his motion for postconviction relief. (Third Amended Petition at 6, ECF No. 73, PageID.915; Petitioner's Brief at 53, ECF No. 74, PageID.976).

Where appellate counsel is charged with ineffectiveness for failure to raise a particular claim, "it is difficult to demonstrate that counsel was incompetent." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). To overcome the presumption of competence of appellate counsel in these circumstances, a petitioner must show that the omitted issues were "clearly stronger" than those counsel chose to assert. *Id.* (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). Here, the issues raised by appellate counsel had a far better chance of success than the grounds petitioner now claims were unconstitutionally omitted.

Further, the trial court rejected petitioner's claim of ineffective assistance of appellate counsel. The state court finding is entitled to an additional layer of deference under AEDPA. 28 U.S.C. § 2254(d)(1); *see Burt v. Titlow*, 134 S. Ct. 10 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). Petitioner has not shown that the state court decision rejecting his claims of ineffective assistance of appellate counsel resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

2.    Prejudice

-51-

The prejudice prong requires the petitioner to show that the alleged error "'worked to his *actual* and substantial disadvantage.'"[13] *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in *Frady*)). "'[The prejudice component of the cause and prejudice test is not satisfied if there is strong evidence of petitioner's guilt and a lack of evidence to support his claim.'" *Perkins*, 58 F.3d at 219 (quoting *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994)). In the instant case, there was very strong evidence of petitioner's guilt.

None of the grounds raised by petitioner provides a basis for a finding of prejudice. Prejudice cannot be shown where, as here, the underlying claims lack merit. *See Burton v. Renico*, 391 F.3d 764, 774 (6th Cir. 2004).

This Court is cognizant of the Sixth Circuit's admonition that the prejudice inquiry "necessitates delving into the actual merits of the claim[s], and that it often makes sense "to consider those merits in the first instance." *Wade v. Timmerman-Cooper*, 785 F.3d 1059, 1077 (6th Cir. 2015). The result in this case would be the same, however, if, under the authority provided under *Lambrix v. Singletary*, 520 U.S.518, 525 (1984) and its progeny, this Court elected to ignore petitioner's defaults for analytical purposes and proceeded directly to a review of the merits of all petitioner's claims.

---

[13]Petitioner provides no new evidence concerning his actual innocence. He cannot demonstrate that failing to address his claims, despite procedural bars, would result in a "miscarriage of justice." *See Carrier*, 477 U.S. at 496; *see also Frazier v. Jenkins*, 770 F.3d 485, 497 (6th Cir. 2014).

a.   Ineffective Assistance of Counsel

In Ground XI, petitioner argues that he was denied his Sixth Amendment right to effective assistance of trial counsel because counsel failed "to make objections on the record to habeas claims V, VI, IX and X[.]"  (Third Amended Petition at 6, ECF No. 73, PageID.915; Petitioner's Brief at 51-53, ECF No. 74, PageID.974-76).

The *Strickland*, standard applies.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  466 U.S. at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.*  (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  On the prejudice prong, the Court focuses on "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."  *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  Petitioner "must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  Petitioner does not approach satisfying either component of this demanding standard.

Petitioner's trial counsel's conduct did not fall below an objective standard of reasonableness.  The work of petitioner's trial counsel was largely responsible for petitioner avoiding a first-degree murder conviction and the accompanying nonparolable life sentence.  Petitioner argues that his attorney's performance was deficient "in failing to make objections on the record to habeas claims [] V, VI, IX and X" (Petitioner's Brief at 53, ECF No. 74, PageID.976), but all of those grounds lack

-53-

merit.  Petitioner's attorney was not required to raise meritless objections.  Counsel's failure to make a frivolous or meritless motion or objection does not constitute ineffective assistance of counsel.  *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007).  Petitioner has not shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

### b.   Prosecutorial Misconduct Claims

The scope of review in a habeas action of prosecutorial misconduct is narrow. "Petitioner's burden on habeas review is quite a substantial one." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000).  This Court does "not possess supervisory powers over state court trials."  *Id.*  "It is the responsibility of the state courts to police their prosecutors; [this court has] no such authority." *Id.* "Therefore, on habeas review, our standard is limited to 'the narrow one of due process.' " *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).  To be grounds for habeas corpus relief, the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181.

In Ground V, petitioner argues that the prosecutor violated his right to remain silent by "admitting evidence of petitioner [] [in]voking his right to remain silent and for an attorney." (Third Amended Petition at 5, ECF No. 73, PageID.914; Petitioner's Brief at 27-30, ECF No. 74, PageID.950-53).

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. CONST.

-54-

amend. V.  In order to prevent coercive custodial interrogations designed to undermine the Fifth Amendment, the Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436 (1966) that, when an individual is in custody, law enforcement officials must warn the suspect before his interrogation begins of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel. *Id.* at 478-79.  Under *Miranda*, evidence of a defendant's custodial statement may only be introduced as evidence of guilt at trial if the defendant was first given such warnings.  *Id.* at 479. Petitioner received *Miranda* warnings.

In *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), the Supreme Court considered whether a defendant's silence during a custodial interrogation could be used, not as evidence of guilt, but to impeach the defendant's testimony at trial.  The Court held "that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment."  The theory underlying *Doyle* is that, while *Miranda* warnings contain no express assurance that silence will carry no penalty, "such assurance is implicit to any person who receives the warnings."  *Id.* at 618.  On this reasoning, the Court concluded that it would be fundamentally unfair first to induce a defendant to remain silent through *Miranda* warnings and then to penalize the defendant who relies on those warnings by allowing the defendant's silence to be used to impeach an exculpatory explanation offered at trial.  *Id.*

The facts in this case are significantly distinct from those in *Doyle*.  Petitioner did not remain silent.  He elected to speak to Detective Smith for several hours after

he had received *Miranda* warnings.  "[A] defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent.  As to the subject matter of his statements, the defendant has not remained silent at all." *Anderson v. Charles*, 447 U.S. 404, 408 (1980).

Detective Smith's questioning after petitioner mentioned an attorney did not violate petitioner's Fifth Amendment rights under *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) and *Davis v. United States*, 512 U.S. 452, 459 (1994).  There is no evidence that petitioner made an unequivocal request for counsel.  *See Davis v. United States*, 512 U.S. at 459.  Petitioner related that he wanted an attorney present to work out a deal before he would "put the pieces together" for the police.  Detective Smith had no obligation to terminate questioning in response to petitioner's equivocal statement.  *Id.* at 459; *see also Henness v. Bagley*, 644 F.3d 308, 320 (6th Cir. 2011).

In Ground VI, petitioner argues that prosecutorial misconduct in closing argument deprived him of a fair trial.  (Third Amended Petition at 5, ECF No. 73, PageID.914; Petitioner's Brief at 31-33, ECF No. 74, PageID.954-56).  Petitioner's argument is not a model of clarity.  He simply states that the prosecutor "attacked and denigrated him by calling him a liar on at least two occasions; expressed personal belief in Petitioner Gordon's guilt; denigrated trial counsel and insinuated that trial counsel was lying as well." (Petitioner's Brief at 31, PageID.954).  Petitioner does not provide citations to the purportedly offending portions of the prosecutor's argument.  Upon review, the Court finds that the prosecutor's arguments were within the scope of permissible argument and none of the purported errors approached the level of so

infecting the trial with unfairness as to make the resulting conviction a denial of due process. *Darden*, 477 U.S. at 181.

Petitioner's argument that the prosecutor improperly appealed to the jury to sympathize with the victim's mother because he referred to Ean French as Mrs. French's "child" rather than her 28 year old adult son (Petitioner's Brief at 32-33) is patently meritless. The prosecutor was simply emphasizing that he did not expect the jury to accept everything from every witness that he had called. The example that he gave was Mrs. French's assertion that "she thought the drugs that were found in her son's home were left there or planted there and, to put it in her words, was left by the killers." (TT13, 5-6). The prosecutor then asserted: "And that may be some mental gymnastics on her part, not wanting to believe that her son was involved in the things he was involved in. I don't know and I guess I don't care. But what she said, obviously was wrong. It was false, either by something that she needed to think about her son, or it was false for whatever other reasons." (TT13, 6).

    c.    Claims Based on Alleged Trial Court Errors

In Ground VII, petitioner argues that Judge Johnston's response to the jury's question regarding Edward Johnigan's testimony about Corey McCullough deprived petitioner of a fair trial because of a potential inference that, because Johnigan and McCullough had already been convicted, petitioner was probably guilty as well. (Third Amended Petition at 5, ECF No. 73, PageID.914; Petitioner's Brief at 34-35, ECF No. 74, PageID.957-58). The jury learned of McCullough's conviction from Johnigan, petitioner's witness. Judge Johnston indicated that whatever Johnigan may have said

about McCullough's sentence was not important because McCullough had not been sentenced. There was no confirmation from the court that McCullough had been convicted of anything. Judge Johnston offered to allow the jury hear Johnigan's testimony again if it believed that whatever Johnigan may have said about McCullough's sentence was significant – an offer the jury apparently declined. The judge's response was appropriate and did nothing to deprive petitioner of a fair trial.

Ground VIII is petitioner's claim that the trial court violated his due process and equal protection rights by admitting, over an objection, certain items of evidence from Edward Johnigan's home.[14] (Third Amended Petition at 5-6, ECF No. 73, PageID.914-15; Petitioner's Brief at 36-39, ECF No. 74, PageID.959-62). The trial court determined that evidence seized from Johnigan's home, including weapons and ammunition, was admissible under Michigan law. (Opinion & Order at 5).

In any event, the extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). An inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 67-68. The admission of this evidence did not deprive petitioner of a

---

[14]Under this heading, petitioner expresses his dissatisfaction with a ruling that the court made on "September 10, 20[0]4," during his earlier trial. (Petitioner's Brief at 37, ECF No. 74, PageID.960). Petitioner's earlier trial is not at issue. His habeas corpus petition is a challenge to his conviction based on the trial that began on October 18, 2004, and ended on November 9, 2004, with the jury's verdict finding him guilty of second-degree murder. (TT1-TT17, ECF No. 37-53).

fundamentally fair trial.  *See Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *accord  Roe v. Baker*, 316 F.3d 557, 567 (6th Cir. 2002) ("Errors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial.").

In Ground IX, petitioner states that the trial court violated his due process rights by giving a modified accomplice instruction over defense counsel's objection. (Third Amended Petition at 6, ECF No. 73, PageID.915).   In his brief, however, petitioner asserts:  "It's not Petitioner Gordon's contention that the judge should not have [given] the accomplice instruction, but rather the modified instruction that was given informed the jury that it could convict on the basis of accomplice testimony, but failed to charge that it could also acquit on the basis of such testimony."  (Petitioner's Brief at 45, ECF No. 74, PageID.968).  Petitioner never requested the instruction that he now claims was improperly omitted.  The objection preserved at trial was to giving an accomplice instruction, not the flaw petitioner now perceives.  (TT13, 127-28).

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review.  Instead, the petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process."  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *see also Estelle v. McGuire*, 502 U.S. at 75 (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law").  Here, the trial judge's failure to *sua sponte* provide an additional instruction that

-59-

petitioner could be acquitted on the basis of an accomplice's testimony did not prejudice petitioner's due process rights.  The accomplice instruction (TT13, 113-14) did not, as petitioner claims, instruct the jury that it could convict on the basis of accomplice testimony.

The jury was instructed to carefully and cautiously consider an accomplice's testimony.  Further, the jury was instructed that petitioner was presumed innocent and entitled to a verdict of not guilty unless the jury was satisfied beyond a reasonable doubt that petitioner was guilty.  It was advised that it was the jury's job to decide the facts of the case.  (TT13, 105-06, 111).  The jury was instructed that it was also the jury's job to determine the extent to which the testimony of any witness would be believed.  (TT13, 111).

In Ground X, petitioner argues that his right to a fair trial was violated when the trial court failed to stop trial proceedings and conduct a hearing after petitioner's sister, Yvonnie Thompson, invoked her Fifth Amendment right against self-incrimination in response two of the prosecutor's questions.  (Third Amended Petition at 6, ECF No. 73, PageID.915; Petitioner's Brief at 47-50, ECF No. 74, PageID.970-73). This claim is meritless.

The Self-Incrimination Clause of the Fifth Amendment provides: "No person shall be compelled in any criminal case to be a witness against himself." The Supreme Court "has explained that this privilege protects a person only against being incriminated by his [or her] own compelled testimonial communications." *Doe v. United States*, 487 U.S. 201, 207 (1988) (quotation and citations omitted).  Answers of

a witness "are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over [her] valid claim of the privilege." *Minnesota v. Murphy*, 465 U.S. 420, 427 (1984).

Ms. Thompson was not compelled to answer over a claim of privilege.  In addition, petitioner cannot assert his sister's Fifth Amendment rights.  "The Fifth Amendment privilege against self-incrimination is a privilege personal to the witness." *United States v. Mayes*, 512 F.2d 637, 649 (6th Cir. 1975).

Petitioner's due process rights were not violated when his sister invoked her privilege against self-incrimination.  The trial court did not commit any error, much less an error depriving petitioner of a fair trial, when it failed to *sua sponte* conduct a hearing after Ms. Thompson invoked her privilege against self-incrimination.  The trial judge had the benefit of the tremendous insight provided by the earlier trial and Ms. Thompson's testimony at that trial.  It was patent from the questions and the setting in which they were asked that Ms. Thompson faced a very real danger of self-incrimination if she gave a direct answer to the questions where she invoked her privilege against self-incrimination.[15]

---

[15]The privilege "extends only to witnesses who have reasonable cause to apprehend a danger from a direct answer." *Ohio v. Reiner*, 532 U.S. 17, 21 (2001). Trial courts are granted "broad discretion" in determining whether the witness has reasonable cause to apprehend a danger from a direct answer. *United States v. Mack*, 159 F.3d 208, 217 (6th Cir. 1998).  "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it was asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Davis v. Straub*, 430 F.3d 281, 288 (6th Cir. 2005) (quoting *Hoffman v. United States*, 341 U.S. 479, 486-87 (1951)).  "The trial judge in appraising the claim must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence."

The prosecutor did not err in posing the questions and he was free to move along to another line of questioning. *See Minnesota v. Murphy*, 465 U.S. at 428. Petitioner's attorney had more than adequate opportunity to cross-examine Ms. Thompson if he believed that any aspect of her trial testimony required further exploration.

In Ground XII, petitioner argues that the accumulation of errors in the trial and appellate proceedings rendered his conviction fundamentally unfair. (Third Amended Petition at 6, ECF No. 73, PageID.915; Petitioner's Brief at 54-55; ECF No. 74, PageID.977-78). Under settled Sixth Circuit authority, a claim that the cumulative effect of errors rendered a trial fundamentally unfair is "not cognizable" after AEDPA. *See Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011); *accord Henshaw v. Berghuis*, 469 F. App'x 418, 423 (6th Cir. 2012). "The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Moreland v. Bradshaw*, 699 F.3d 908, 931 (6th Cir. 2012). Moreover, because the individual claims are without merit, petitioner cannot show that any cumulative error violated his constitutional rights. *See Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

In summary, the Court finds that Grounds I through IV of the Third Amended Petition were rejected by the Michigan Court of Appeals and the claims of ineffective assistance of appellate counsel in Ground XI were rejected by the trial court in its decision denying petitioner's motion for postconviction relief. Petitioner has not shown

---

*Hoffman*, 341 U.S. at 487 (citation and quotation omitted).

that these decisions were  "contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The Court finds that Grounds V through XII are procedurally defaulted and that petitioner has not shown cause and prejudice or actual innocence to excuse the defaults.

### III.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.   A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.*   Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467.  Consequently, the Court has examined each of petitioner's claims under the *Slack* standard.

Petitioner cannot demonstrate on Grounds I-IV and the claims of ineffective assistance of appellate counsel in Ground XI that reasonable jurists would find that the denial of habeas corpus relief on each of the grounds raised in his petition is

debatable or wrong. *See Slack*, 529 U.S. at 484. Petitioner cannot overcome his burden on all other claims which are barred by procedural defaults. He cannot demonstrate that reasonable jurists "would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.; see Kissner v. Palmer*, 826 F.3d 898, 901-02 (6th Cir. 2016). Accordingly, the Court will enter an order denying petitioner a certificate of appealability.

## Conclusion

For the foregoing reasons, a judgment will enter denying the petition because it does not provide a basis for federal habeas corpus relief under 28 U.S.C. § 2254.


Dated:   September 23, 2016                          /s/ Paul L. Maloney
                                                     Paul L. Maloney
                                                     United States District Judge